At this time, we'll hear GEOMC v. CalMera Therapeutics. Good morning, Your Honors. May it please the Court, I'm William Feldman of Haynes & Boone, and I'm appearing on behalf of the Defendant Appellant, CalMera Therapeutics. We seek reversal and remand of the judgment below. The parties in this case had a contract. Under that contract, the Plaintiff Appellee, GEO, would make and supply CalMera's patented pain management devices, and the parties would, in the words of the contract, share profits of 50% each from sales of the devices. Let me stop you right there. When you say you had a contract, are you referring to what's called the Territory Exclusive License Agreement? That's right, Your Honor. Yes. Is that the only contract between the parties, other than the security agreement? Your Honor, there's the Memorandum of Understanding, which is an agreement. But is there a purchaser and seller agreement to buy product in addition to the licensing? So when you say the contract, you mean the license agreement. That's right. That's correct. Yes. We don't have a purchase agreement. To be clear, the agreements at issue here are the license agreement, the Territory Exclusive. The MOU. There's a 2008 Korean distributor appointment. Yes. There's the 2010 Memorandum of Understanding, which I'll talk about, and there's the 2012 security agreement. Okay. All right. So in the absence of a traditional, if I may put it that way, seller-buyer contract, in this deal, who's the seller and who's the buyer? Well, it was more of a joint venture in the sense that this was a product that was coming onto the market. Jio was assembling the devices. We were going to go out and sell them to third parties, to end users, hospitals, doctors, the government, et cetera. And then we would share the profits to the extent that there were profits. I'm just trying to understand. Jio is the manufacturer. We agree on that. We say these same things. Who is selling to an end user, Jio or CalMari? CalMari. CalMari is the seller. And Jio, okay, so to be clear, so CalMari would sell in the United States to U.S. customers, and Jio would sell the devices in South Korea in 2013. And how about other places, India, for example? Who sells there? They could sell elsewhere overseas, too. Who? Jio? Jio. Sorry, Your Honors, Jio. So is CalMari selling only in the U.S.? That's right, and that's confirmed by one of the documents Your Honors identified in your letter. I would note it's a document starting at J1925, and there are some outside the United States. You can see there, there's one to Italy, one to Bangladesh, one to Greece. So it's your understanding that if CalMari makes a sale in the U.S., it sends back to Jio half of the profit? Yes, that's right. And also cost of manufacturing? Well, that would come out of the – the profit would be determined based on the cost. I mean, you have the – Right, the profit would be, but, well, let's take an example. Let's say Jio spends $70,000 to make a machine. Okay. An end user in the U.S. buys it for $100,000. All right, $30,000 profit. $30,000 profit. What does Jio get? It would get $15,000. Plus $70,000? There was no agreement to pay them the manufacturing costs. Well – There wasn't. I mean, the agreement was – Do they absorb it? I mean, they make a – they spend $70,000 to make a machine and get $15,000 in profit? That's not a very good deal. I don't – under the license agreement, that was the agreement. We would share profit. Your Honor – That's the agreement you want us to enforce? You spend $70,000 to make it and you earn $15,000? Well, Your Honor, the – That's like the fellow who said, I lose money on every sale, but I make it up on volume. Well, if I can redirect, the point is not what we – the dispute is not what we owe, it's when we owe it. And that's – But in order to determine that, I think, at least I need to understand what the deal is. And I'm a little surprised if you tell me that a fellow who spends $70,000 to make a machine only gets $15,000 upon a sale. Well, I think there's really no evidence that $70,000. It was – Supposing it's $50,000, $40,000, $30,000. You pick your number. And regardless, that was the arrangement the parties reached. I am – my – And that's the deal? That's the deal. You're serious? He never gets his cost back? They share the profits. They share – and then, actually, Your Honors, even – They share the profit, but before you get to profit, he has incurred a cost of some several thousand dollars. But even under the memorandum of understanding in 2010, GEO expressly agreed to get only $10,000 per device. That was it. It sounds as though the initial deal is, for reasons that have been explored by Judge Newman, unaccountable, difficult, and unworkable. So the memorandum of understanding simplifies things. It says GEO will receive $9,000. Eventually, it was changed, I think, to $10,000 per machine. Why did they have to wait for CalMare to sell it on to an end user before the purchase price could be paid? Well, for several reasons, one of which is under the original – if you think about it, let's compare it to the original agreement. The original agreement was they would send us the devices. We would sell them. We would make capital from the sales and then give them a share of the profits. At the time, we didn't have, say, $4 million just in the bank waiting to pay for these devices when they arrived at our doorstep. But if all you're going to pay is $9,000 or $10,000, you don't need $4 million. Well, if they deliver – We don't know what the manufacturing cost is of these things. Just because they're sold for $90,000 doesn't mean that it costs $60,000 or $70,000 to make it. Perfume sells for a fortune and probably is formulated for pennies. What I can say is that at the time, the parties were both commercially sophisticated, agreed that this was the arrangement. And in fact, actually, the other costs were to be absorbed by CalMare in this case. We would pay them. Other costs? The other costs. The other costs of manufacturing. The other costs of manufacturing. What were they? I'm sorry. The development costs. Oh, the development. The development costs. Who gets to pay the costs of manufacturing? My best answer, Your Honor, is that under the contract, GEO was obligated to pay its own costs to manufacture the devices, and that would be it. If it's unconscionable, I'm not sure what — I mean, we're the ones — they're the ones who are seeking to enforce the contract on us. So I'm not sure why, under that circumstance, how we would owe them any amounts. They might in quantum error. But the contract itself — I mean, I'd like to touch on — Isn't this all resolved by the testimony of the executive vice president of GEOMC who testified? What is the testimony that went contrary to it? Well, there was — I mean, that's why there's a hearing. People come forward, and they have a witness who says this thing may be a mess, which it certainly is. I mean, you can't explain it, frankly, and I don't blame you. I can't either. I've read this stuff. But you have testimony. It breaks through. And you don't have testimony on the other side. Well, the answer, Your Honor, is that we believe that the original agreement was unambiguous. There was whatever the cost of the agreement was, payments were to be made after devices were sold to third parties. So then this memorandum of interest — But for reasons that Judge Newman has pointed out, it didn't really make very much sense. So it can't be very surprising that the parties would sit down and enter into a memorandum of understanding until they understood what it is they agreed to. And that's fine. And I think that the memorandum of understanding does change the amount that we owe — that the CalMER owes to GEO, of course. Well, let's turn to that. It says — the memorandum of understanding says the following describes the understanding regarding the revenue splits. Right. If you sell it for $100,000, what's the revenue? I mean, wouldn't you subtract out the profits after the — But it says they're going to split the revenue. Right. Well, no, no, no, it doesn't say that. It says that from the revenue, GEO would be paid $9,000. There's not a split. It doesn't say from the revenue. It says regarding the revenue splits. Regarding the splits. But ultimately, GEO, regardless of what the revenue income was, would be paid $9,000 and later $10,000. That was it. Maybe it means both. Maybe we'll split the revenue and you'll get — since we're clarifying the royalty agreement, you'll get $9,000 as your share of the royalty. And, Your Honor, and that's — but that would support our interpretation in which we did not owe them the devices upon delivery. I mean, how can there be revenue? How can there be profits? How can there be anything? It may be. It may help you a lot to read it as revenue. The word revenue, if you read it to mean revenue, would help you a great deal. And that is what we're saying. And that is — I think that lost in all this is this basic point. So in my example, if you take revenue to mean revenue, a sale for $100,000 would mean they get $50,000 as half of the revenue plus $9,000 as their share of the royalty. Well — They'd at least get $60,000 instead of $10,000. Well, certainly neither party felt that was the way the agreement was read. And if you look at one of the exhibits Your Honor's pointed in the letter, J.A. 1136, I mean, here, you know, Jio's getting early on $9,000. I mean, in March of 2010, they're getting $9,000 per device with 30 devices. They were owed, in their view, $270,000. That was it. Well, I'm looking at the next page. I think they're all the same, 1137. 1137, yes, Your Honor. The 9,000 items, some of them are four, but some are nine, is under the column called price. Right. Was that the price? That was the unit price. 9,000? Yes. It was sold to an end user for 9,000? That particular one, that was, no, all this is showing, this column that says price, is only the amount that Jio said it was owed. So the word price at the column head is incorrect, is that right? That's correct. And at trial, there was testimony from Mr. O, the executive vice president, who said that was the unit price, i.e., the per device amount. So if you multiply 30 devices. Per device amount for what? Owed to Jio. For its share of royalty. For share royalties, however you want to describe it, that was the amount we owed. But however you describe it, it's not a price. Was that its 50% share or the total price? Well. The $9,000, was that the 50% owed to Jio? That was the 50% owed, and that was also after, if you look, Your Honors, the MOU was signed in January of 2010. And both before and after, Jio is saying it gets $9,000. There are a few $4,000 device amounts. But if you look under their own spreadsheet, the 50% was $9,000. After the MOU, they said we get $9,000. If you times that by 30 units, $270,000. That's what they're claiming they're owed. But this is your document. No, this is Plaintiff's Exhibit 4. No, the one on JA 1136 and 7. Your Honor, that's Plaintiff's Exhibit, Trial Exhibit 4. This is Plaintiff's Exhibit. This is the one they created for trial. All right. And this is the one they created for trial. And this is what they're showing that they claim they're owed. And if you look at the bottom page, on 1138, count AR, count receivable total, they're saying we owe them $6,772,000 and change. They received from us $2 million, so $2.1 million, and the amount remaining, $4.6 million, which is the amount of the judgment. So if you take all this together, that is what they're claiming they're owed. Our argument and the way we interpret the agreement and the plain wording of the agreement is that we owe whatever amounts, whether it's $9,000, $10,000, a 50% share of the profits. Only on delivery. No. Only on sale. Only on sale. And your theory is you can't even calculate a profit until you know the sale. Right. That's right, Your Honor. That's it. I say I'm going to wait over my time. But that's the basic point, is that they claim that they're owed $4.6 million because somehow the parties changed the agreement so that we had to pay them millions of dollars up front. And the answer is just that simply was never written down. In fact, the district court agreed it was never written down. Their own witness, Mr. O, said they never wrote it down. To this court, Gio argues that the MOU is silent at the timing of payment. Can I ask you about another document? Oh, sure. This is on, well, there are several, but I'm looking at one, a JA 1873. Right, Your Honor. It's captioned the top competitive technologies. Yes. So they prepared it. Is that right? Well, this is our document. This is yours? They're not. Oh. Now, there's some redacted items, and I'm not asking you to tell us what they are. Yes. But they appear opposite the word vendor. Mm-hmm. And on the third item, entry three at the bottom, vendor is G-E-O-M-C. Right. That's you. Well, that's them. I'm sorry. So you said they were the vendor. Yes. Without identifying the person, can you tell us the category of person who is in the redacted line marked vendor? On the previous, on the entry one and two? Yeah. No, I cannot. I cannot. You don't know? No, I don't know. I see. Okay. And what I would point out also with this document, Your Honor, is it talks about a payment MC2 shipment. Now, this is not the device. Whatever this is referring to, the device we're talking about is an MC5A. Not an MC2. So whatever this wire transfer was, was not for the devices. So I submit this document, although it shows we paid G-E-O sums of money, is not related to the issue before the court, which is the timing of the payment. Okay. And if I could make one last point, Your Honors. We talked about extrinsic evidence, and evidence presented at trial, Mr. O's testimony, Judge Jacobs. Exhibit five, which starts in 1925, J1925, answers the question. If you look at this, both before and after the memorandum of understanding is executed, in January of 2010, we are calculating amounts owed based on sales. For example, the very first one, Gary Martin, M.D. One device sold. We owe to G-E-O $9,000. After the MOU, the same agreement, even up to 2016. The last entry, Selina Ellis, December 21, 2016. We sold one device. We owe G-E-O $10,000. That was always our understanding. We would sell the devices. We would pay them out of the revenue we get from the sale. Thank you. I hope that answers some of your questions. The security agreement, which we haven't touched on. No, I haven't. Both parties signed that. Yes. Do we know who prepared it? I believe ‑‑ I cannot answer that off the top of my head. In any event, it refers to Calamari as having purchased the secured items. Is that right? That's what it says, yes. How did they become the purchaser? Well, that's ‑‑ I'm sure I can answer your question. That document may be inaccurate in certain ways. It was not a document that we dispute its validity in its entirety, the security agreement. Did this have to get translated from Korean? Do you know? I don't think so. This was executed in English? That's my understanding. But English was the second language for one or more of the people who entered into this. That's right. Or perhaps even a third language. For Ms. Lim, the CEO, SBO, the executive vice president. Was he fluent in English? Do you know? GEO's counsel can answer that better. At trial, he testified through a translator. So I would say no, Your Honor, if he testified through a translator. Your public filings. Yes. The 10K? Consistently lists $4 million as current liabilities owed to GEO MC. How do you square that with anything you're saying this morning? Okay. I'm glad we're going to get to touch on that. Because initially, I want to step back for a second. The answer is that this was an accounting rule that was essentially first imposed on CalMERA by the SEC. We wanted to list these devices as on consignment. And then eventually, we're told to list them as liabilities. Now, this was back. But you're the ones who listed it. If it's not so, then you don't list it then. I'm getting to the point. So at trial, GEO's counsel asked our CFO, Mr. Ricaric, about this. And he said, well, at the time, it was based upon optimism. That we would sell these devices within a year. At the time, we initially had significant purchase orders. We were selling, as you can see, under Exhibit 5, we were selling devices. I mean, these devices were going off the shelves. So the current liabilities was based upon optimism. Yes. I mean, look at that. 118 were sold in 2010. I mean, there were a lot going out. So this was based on the idea that this is not something we want to have delivered to us and have it sit on the shelves for three years. We want to sell these devices. And in fact, we were selling them. And that was why they were listed as current liabilities as opposed to long term. And instead of looking at that document, Your Honors, I would draw the Court's attention to the documents that are both Defendant's Exhibit 5, J.A. 1925, and also other exhibits in the record. In fact, this is the last, if I make one last point, we talk about Exhibit 4, which is the plaintiff's exhibit. And there, these devices are listed as payments to GEO upon delivery. In 2012, we respond to this listing and say that this is inaccurate, this is an incorrect representation of the parties' agreement, that devices should be listed by serial number because payment is owed as they are sold, not as they are shipped. That is very important. That's on GA 212 and 213. No, I'm sorry, rather 211, rather. Serial number, not just by shipment, because we have to account for each device as it is sold and they are not shipped out as they come in, necessarily. So this is after the MOU. There is significant evidence in the record that we never agreed to pay millions of dollars up front. You've reserved a couple minutes rebuttal. Yes. Thank you so much, Your Honor. We will certainly hear you then. Okay, great. Thank you. Good morning. Good morning, Your Honor. May it please the Court. My name is Kristen Weil from Denton's U.S. LLP on behalf of Plaintiff Appellee GEO MC. I'd like to start with some of the questions that you raised with CTI's counsel. The judgment should be affirmed for precisely the reasons that your questions identified, which is that the parties initially entered into the 2007 agreement before sales were being made, and there were a host of factual issues that that agreement did not address, things about cost of manufacturing, shipping costs, and the like. Which was the cost of manufacturing these things? There's no evidence in the record of that. Can you estimate it? I mean, it's not pennies to build a machine like this, is it? I'm sorry? It's not pennies to build a machine like this. No, not at all. Can you give us a range? I'm unable to estimate it, but it is a significant cost. Around $50,000 at least? I don't want to mislead the Court. I do not know with certainty what the cost of manufacturing is. No, not certainty. Just make a ballpark range of estimate of this machine. I certainly think that that is not an unreasonable estimate, that it does cost around that amount of money. And because so many of those factors were not addressed by the 2007 agreement, that is why the parties entered into the MOU. And it is the unrebutted and credible trial testimony from GEOMC's Executive Vice President, Mr. SBO, that shared with the Court that the parties agreed at that point that rather than engaging in this kind of messy profit sharing arrangement, which would necessarily involve resolving some of those issues that your questions raised, that instead they would move to a flat fee basis. And there is no testimony in the record . . . Flat fee for what? For delivering a device to CTI, GEOMC would be entitled to payment of $9,000, which was later increased to $10,000. You're adding the words for delivery of, and then that sort of begs the question of when the payment has to be made. But what is the $9,000 for? Is that a royalty payment? Is that essentially a quit claim? You made the machine. I got it now. That payment is for the royalty. That is the sole payment that GEOMC was . . . The royalty, but they made a machine, didn't they? That's correct, they did manufacture . . . So they don't get paid for manufacturing the machine? GEOMC agreed that its manufacturing costs would be covered by that flat fee. The parties had pretty optimistic sales visions at the outset, which it became clear could not be realized. Now I'm with Judge Newman because I don't understand how they can . . . It's pessimistic if you're going to sell large numbers of machines at a loss, right? The more you sell, the more you lose. I don't understand this. Well, in hindsight, the deal may not be as favorable as we'd like. That was the deal that was agreed to that GEOMC would receive. Is that why you want to tell us that that's the deal? Because it sounds crazy. Isn't the sensible way to understand this that, of course, the manufacturer is going to get its costs back the way every manufacturer at least tries to, and it's going to get on top of that half the royalty? I certainly agree that that would be a more favorable deal that GEOMC would be . . . But you don't think that's the deal they made? Well, these are the arguments that we made at the district court, and so I don't want to expand beyond them and reach into evidence that wasn't properly before the court . . . Is it the case that whatever your costs are, manufacturer, whatever the royalty is, you are content to take $10,000 per machine? Well, we'd certainly take more, but yes, $10,000. Is that the judgment? Yes. You get $10,000 a machine, right? Yes, that's the basis for the judgment that the district court entered. And if they don't pay $10,000 times the number of machines, then, as I understand the judgment, you can go and take the machines and sell them in a commercially reasonable way until you've made the sum that you owe based on $10,000 per machine. And if there's money over, you pay it to the manufacturer, and if there are machines left over, you give it back to CalMere. Yes, the district court's judgment bent over backwards to allow . . . Am I correct, though? I mean, let's forget which way people are bending. The question is, what's the deal? If you, as a manufacturer, get $10,000 and you're happy with that, that's enough? That's correct. The judgment is based on that purchase price, less what CTI has paid for some amount of devices. The unpaid devices need to be paid for. The judgment provides that CTI was to pay the $4.6 million, representing that unpaid sum, and if it was unable to do so by the end of December 31, 2017, GEOMC was authorized to take the devices and sell them in a commercially reasonable manner. And, as you say, if there were any excess devices or excess proceeds that would go above and beyond the amount of the judgment, that would be returned to CTI so that GEOMC was not receiving a windfall judgment, just receiving precisely what it was . . . Let me ask you about the timing. If we look at the MOU, it says you will receive $9,000 for the sale, right? Correct. So why are you entitled to get $9,000 before the sale? The sale there refers to GEOMC's sale of a device to CTI. It is payment upon delivery, and that is . . . Where is the agreement that says GEO sells to CTI? As Mr. O credibly testified at trial, that was the terms of the agreement that the parties reached when the MOU was executed to amend the 2007 agreement. When you say the terms of the agreement, you mean there's some oral agreement to that effect? Well, the MOU is silent on certain aspects, which CTI is challenging, but those ambiguities were cleared up and addressed by Mr. O's credible and unrebutted trial testimony. And his testimony indicates that the parties agreed that GEOMC would receive that $9,000 upon the sale of a device to CTI, and that amount was later increased to the $10,000. So you're saying CTI is the purchase of all U.S. sales or worldwide sales? Originally, the agreement contemplated worldwide sales. There did come a time where that was amended, and certain territories were excluded from CTI's ability to sell globally. But yes, originally CTI was entitled to sell to third parties globally, and GEOMC was to receive its flat fee payment for that. And when CTI failed to provide that payment, they breached the contract, which forms the basis of the district court's judgment here, which was based on credible, unrebutted trial testimony, documentary evidence, and should be affirmed in all respects. When you say document, what document shows CTI is the buyer? Well, their SEC filings, for one, as you pointed out, list the liability to GEOMC as a current liability at trial. Do you know they owned inventory? Yes, I believe that it- It listed the unsold machines as property of CTI? It listed it as a current liability to GEOMC. You're talking about the receivable. Presumably the balance sheet showed assets. Yes, they are listed as assets there. Did it show their, as you call them, purchased machines as assets? Yes. It did. I believe that's correct, yes. We'll find that in the SEC filing. I believe that the assets list approximately $4 million in assets, and that's attributable to the $4 million that CTI owes GEOMC for the purchase of those devices, for which payment was due upon delivery. You're talking about the receivable again. The balance sheet shows both assets and liabilities. So the assets are listed at approximately $4 million, and the liabilities to GEOMC, which are current liabilities, which should have been paid within the year, i.e., reflective of the fact that payment was due upon delivery, that also shows the $4 million. There were some unsold machines, weren't there? Yes, CTI's- Were those listed- I'm still trying to probe the claim that CTI purchased from the manufacturer, and I'm trying to understand were unsold machines listed on the SEC filing as assets of the buyer? Devices that were unsold to third parties, but which CTI had purchased from GEOMC, I believe are listed. There's a countervailing in the asset in the balance sheet. And you see this from other documents as well in the record beyond the SEC filings. CTI admits in a number of documents which were admitted at trial that there is an account- or, excuse me, that there are significant amounts outstanding, and CTI's own counsel conceded in closing arguments that over $4 million was owed. So I don't think that that's really credibly in dispute that CTI owed GEOMC for the devices that GEOMC delivered to it. I have one question about the 18% prejudgment interest. That number appears in the security agreement, and yet the district court applied it to the whole underlying judgment. Wasn't that error? No, it was not, because when you review the security agreement and that provision which provides for the 18% interest, it's clear that upon a close read the 18% interest is not limited to only the liquidation costs, but applies- Why are the liquidation costs mentioned in that context? If it was going to be everything, then it's really very easy to write it. It looks like it's 18% for the liquidation costs, and then it's something else, probably whatever is the statutory rate of probably 10% for the rest, assuming you win, of course. I disagree. The security agreement, which was prepared by CTI's corporate counsel and secretary, the Cutler Law Group, in English, notes specifically those liquidation costs to avoid any questions and avoid doubt. So liquidation costs that would be associated with preparing the devices for sale, in an abundance of caution, those were expressly called out as costs that would be recoverable and would not have to be eaten by GEOMC. But the interest provision read as a whole does not say only interest there on those liquidation costs or interest on liquidation costs only. When read as a whole, it's clear that the interest provision applies to the principle and the liquidation. There's no question you get interest if you win on both. The question is, what is the 18% for? Is it for the whole thing or is it for liquidation costs? It's for the whole thing, and that's because GEOMC required some security that these payments would be met. At that point, by the time the security agreement had been executed, CTI had fallen in arrears, had requested and received hundreds of devices that it hadn't paid for. GEOMC quite reasonably needed some assurances that its payment obligations would be met. You're inviting us to read it, as you say, as a whole, and their argument is the 18% only applies to the phrase immediately preceding it, which is costs, right? That's correct. So there are at least two ways to read that document, right? Fair enough? I believe, yes, that that is their reading. Given that, why would any court want to read an 18% interest rate, which I think you'll agree is rather high, to apply to the more expansive reading of the document instead of what appears to be the more literal reading? Quite simply because that's what the parties agreed to. Well, that begs the question. We're trying to figure out what they agreed to. Well, this contract was prepared by CTI's own corporate counsel and its corporate secretary. And it doesn't say applies to the total. It says costs on which there is 18%. It says interest shall apply to the obligations and the costs. It does not say interest limited to the liquidation costs. It says the 18%, as you just said it, will apply to the obligation and the costs? Where does it say that? I do acknowledge that the Section 9 is not drafted as a model of clarity. I do concede that. But if you look, it's several lines above where it refers to interest being applicable to the obligations and to the liquidation costs. Now, CTI is laser focusing in on one line and ignoring all that came before it. But it's clear when all of that is read together, Section 9, that there's no carve-out that the interest only applies to the liquidation costs. And this is what the parties agreed to. I agree it is a higher interest rate than you may see in other contracts. But parties are free to contract to what they want to. And GEOMC, given the history here where CTI was not paying for all of the devices that it had purchased from GEOMC, reasonably believed that may be what's needed in order to protect its financial interests. And, in fact, that's borne out. Because as we sit here today, GEOMC has not been paid one penny since 2011. So it's been forced to wait seven, eight years to get paid for these devices. So, in light of that, the 18% interest certainly doesn't seem unreasonable to me. Now, this judgment, am I right, it gives you money for unsold machines? Again, machines that are unsold to a third-party customer. Yes. Yes. And what part of the judgment is attributable to that portion? The principal part of the judgment is approximately $4.6 million. CTI admitted that it has sold 61 devices since 2011, when it last made payment to GEOMC, for which it has not remitted any payment. So, based on the numbers that CTI has provided, which, frankly, GEOMC can't verify their accuracy, but based on what CTI has admitted it has sold, 61 devices, or $610,000, is associated with devices that have been sold to third parties but not paid for. $610,000? Yes. At summary judgment, the court determined that there were 61 devices that CTI had sold. But you actually get $9,000 for each one, right? No. Under the MOU? No, because the parties agreed that the price would be increased to $10,000. So, $610,000 at $10,000? Yes, and then, of course, CTI admitted at trial that it's continued to sell devices into 2017, so presumably that number is not precisely accurate for what is owed. Right, so it might be a little high, but you got $4 million, right? $4.6 million is the total. So if $610,000 is what you're due for those that are sold, plus perhaps a little increment for those sold thereafter, how do you get from there to $4 million? Well, you get there via the security agreement, because the security agreement provides that if CTI fails in its payment obligations, GEOMC is entitled to enforce the security agreement, recover all of the devices. That's our Raplevin claim. And, again, we do believe that the contract ambiguity was resolved through the trial testimony and through the documentary evidence. You get to keep the machines plus $4 million? No, so the judgment is carefully crafted to avoid that kind of a double recovery. You have to sell the machines in a commercially reasonable way, correct? Correct. You have to sell as many of them as necessary in order to recover whatever you have not at that point received from CTI. Correct. And then if you overachieve at the auction, you send the money to CTI. And if you have unsold machines, you send them back to CTI. Yes, that's what both the judgment and the UCC provide, and that's all that GEOMC is asking for. But, again, because the district court, relying on unrebutted trial testimony and a bunch of documentary evidence, found that payment was due upon delivery, the amount that needs to be satisfied is the $4.6 million in principle. If we regard the agreements as unambiguous and we don't look at any of the extrinsic evidence, which is the way we would do it if we regarded the agreement as unambiguous, and if we thought payment was only due upon sale, do you agree we would have to remand? Well, I disagree strongly that the contract is unambiguous. I understand that. That's why I made it an if. If the contract is unambiguous- And means payment on sale. Sale to a third party. Well, I certainly think that there's a portion of the judgment which need not be disturbed. There's clear liability as to part of it. It would need to be remanded for recalculation, but I do not believe that the contract is unambiguous. And I think that it's not clear error for the district court to have relied upon the only witness who has firsthand knowledge of the negotiation and execution of all of the agreements at issue. There's no documentary evidence, which is that GEMC offered that's inconsistent with that testimony. And CTI did not meet its burden of showing that that testimony was not credible, was not accurate, and therefore- No, thank you. Okay. Thank you. We'll hear rebuttal. Mr. Feldman. Thank you, Your Honor. I first want to clarify a couple of points about this agreement. And it was not as if GEO was chilling out huge amounts of costs for manufacturing and getting nothing in return. GEO was getting the right to sell our licensed technology in Korea. GEO was getting a right to profit share on our technology in addition to being able to sell the device in Korea. And, in fact, that brings up another important point on the damages. $610,000 is the amount that we owe to them for sales. Cal Merrill owes to GEO. Now, GEO admits that they sold at least 30 of these devices in Korea, but they never paid us a dime for any of those sales. That's at least $300,000. Well, I think the district judge decided that there was enough on the plate without going global. You say the money is going the other way. Well, you have to subtract out the money that they owe to us, and that's for sure. The bigger point here is that GEO is repeatedly relying on agreements that just don't exist. As Judge Newman has pointed out, there is no purchase agreement. There was no agreement. Everyone agrees, the district court, Cal Merrill, GEO, agrees the parties never wrote down any amendment to the timing of payment. This construct that we now owe $4 million for these devices, when parties initially agreed to a profit share, it simply doesn't exist in any of the agreements at all. In fact, the extrinsic evidence, if you need to go there, doesn't support that. And I don't think the court needs to go there because this concept of silence in a memorandum of understanding, permitting an amendment, permitting the court to then go to extrinsic evidence to find terms the parties didn't agree to. Does the record show what the 61 devices that were sold to third parties were sold for? I believe it should be right at that exhibit. Oh, the actual selling price. Yes. Oh, yes, yes, Your Honor. Well, there was testimony from the CFO, Mr. Rekaric, who testified as to the sales, some of the sales. There wasn't a testimony as to every single device. Well, what was the retail price of this? There were some that were $80,000, $90,000. So it would seem to be a really sweet deal for your client to pay $10,000 each for these things. Well, first of all, that was the agreement under the memorandum of understanding. That was what they were entitled to. In addition to having the right to sell our technology in Korea, in which they made significant money off of, in fact, under the MOU, they could sell those devices in Korea for $100,000 and pay us $10,000 after the memorandum of understanding. If I may jump to a completely different subject, which is what Judge Pula raised. Yes. If 18% is not the party's agreement for the payment of all arrears, what did the contract say? And it was only limited to the liquidated costs. What did the agreement say would be the rate of interest for everything else? The license agreement doesn't have a rate of interest. Would it be the New York rate? Well, the Connecticut rate. Connecticut, excuse me. Well, that would be if there's a judgment, but presumably parties did not anticipate that they were going to be in court. Well, two points. One is the parties, if there's no prejudgment interest at all under the license agreement, then there may be some basis to impose a statutory rate that's equivalent to the post-judgment rate of interest of 1%. The point that Judge Pula raised was a very important one in the sense that this separate agreement, this security agreement, they're claiming imposing 18% interest rates on amounts we owe to them for breach of the license agreement. And the error is made very clear by the fact that the Court applied an 18% prejudgment interest rate on amounts that accrued in 2010, which was nearly two years before we ever signed the security agreement, purportedly signed the security agreement. Counsel, counsel, I have a question. These 30 devices that you allege Geo sold in Korea, that was part of a counterclaim, wasn't it, that the district court rejected? It was part of a counterclaim. It was part of an affirmative defense, the set-off affirmative defense, which was pled. And what was the basis for the district court rejecting your counterclaims? The district court rejected, well, that and the set-off defense because it found that we didn't sufficiently plead it. It found that we didn't take discovery on it. And it found that somehow Geo's device sales in Korea involved an entirely separate agreement. And that just simply wasn't the case, Your Honor. We pled it, and to the extent that it could have been pled more clearly, we should have had a chance to re-plead it. In addition . . . It was in your answer, yes? Sorry? It was in your answer? Yes, that's right. It was affirmative defense in the answer. And we sought discovery. If you look at the deposition of Mr. Oh, the executive vice president, we ask how many devices did he sell in Korea. He gives a vague answer. We then ask for a request for production of documents regarding those sales. We then move to compel the deposition of the CEO of Geo, asking her about device sales. We ask her how many did she sell. She says about 30. So we sought this information. Under the same contract, we're entitled to receive payments for that. And yet, all that evidence was excluded before we ever had a chance to submit it. And I submit to the Court that if you take the six . . . You're saying under the same contract? You mean that the license agreement spoke about foreign sales as well? Particles share profits of 50 percent each. And if you look at, in fact, Geo points out in their brief, several points in which the contract, Article IV, says that Geo owes payments to CalMare for its sales. They had to account for their sales, both the number and the price, and they had to pay us on a monthly basis. Your SEC filing didn't reflect that at all. I mean, the explanation you gave for it really didn't account at all for any offset. We weren't getting any offset. They were not paying us anything. And, in fact, the accounting . . . They were supposed to provide an accounting under the contract. You were saying you owed it. If there was an offset, you wouldn't have owed it. You would have owed less. It would have been offset. It would have been reduced. It would have been less. But I think that's based on the assumption that we actually knew they were making sales in Korea. I mean, right? If they were making sales, then we would owe it. Then there would be an offset. But we never . . . It wasn't until the trial that they told us anything about the sales, until we actually moved to compel the deposition of their own CEO, before they kept it hidden. You know, they . . . That is . . . I'd like to sum up by just pointing out a few basic points to the Court. One is, there's no agreement to change the timing of payment, at all. It was made after sales ten years, at all times. Second, they seek to import an 18 percent interest rate, an interest rate that is more an interest than it is in the judgment, based on an entirely separate agreement. And, after not disclosing any of their own sales in Korea, and getting all of that evidence excluded at trial, they now seek $4.6 million from CalMeri. We ask that the judgment be reversed for all the reasons based in our briefing. Thank you. Thank you, both. We will reserve a decision. The last case on calendar is Forwar Minow v. American Airlines. That is taken on submission. That's the last case on calendar. Please adjourn to court. Court is adjourned.